UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

In re:                                                        :
                                                              :
  MSR RESORT GOLF COURSE LLC, *et al.*,                       :
                                                              :
                                          Debtors.            :
------------------------------------------------------------:

FIVE MILE CAPITAL PARTNERS LLC,                               :
                                                              :
                                          Appellant,          :
                                                              :
                        v.                                    :
                                                              :
MSR RESOURT GOLF COURSE LLC, *et al.*,                        :
                                                              :
                                          Appellees.          :
------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:   01/07/2014

13 Civ. 2448 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

This bankruptcy appeal stems from the financial collapse of a group of vacation resort properties (the "Resorts").  On February 22, 2013, the Honorable Sean H. Lane, United States Bankruptcy Judge for the Southern District of New York, issued an order (the "Confirmation Order") that confirmed a plan (the "Plan") liquidating the debtor entities and transferring their portfolio of resorts to GIC Real Estate, Inc. ("GIC" or the "Purchaser").  GIC, it bears mentioning, is both the sovereign wealth fund of the Government of Singapore and, as a result of certain mezzanine financing it arranged, a pre-petition creditor of the bankrupt debtor entities that collectively owned and managed the Resorts.

Appellant Five Mile Capital Partners LLC (the "Appellant") is also a pre-petition mezzanine lender, and was the only such creditor to receive no return

on its investment from the Plan.  In this appeal, the Appellant seeks to modify the confirmed Plan in an effort to change that fact.  For the reasons set out in the remainder of this Opinion, the appeal is dismissed.

BACKGROUND[1]

**A.    Procedural History**

**1.    The Parties and the Debt Structure**

The entities involved in this bankruptcy (the "Debtors") are numerous and interrelated.  A real estate investment trust, MSR Hotels & Resorts, Inc. (the "REIT"), sat at the top of the corporate structure.[2]  The REIT owned a number of entities, some of which are Debtors in the bankruptcy proceeding

---

[1]    The facts are drawn from the Opening Brief in Support of Appellant Five Mile Capital Partners LLC's Appeal from the Bankruptcy Court's February 22, 2013 Confirmation Order ("Appellant Br."); the Brief of 450 Lex Private Limited, C Hotel Mezz Private Limited, and Certain of Their Affiliates in Opposition to Five Mile Capital Partners LLC's Appeal from the Bankruptcy Court's Confirmation Order ("Purchaser Opp."); Appellee's Response Brief in Opposition to Appeal from the Bankruptcy Court's Confirmation Order ("Debtor Opp."); the Reply Brief in Further Support of Appellant Five Mile Capital Partners LLC's Appeal from the Bankruptcy Court's February 22, 2013 Confirmation Order ("Appellant Reply"); the Amended Declaration of Adam Gallistel ("Gallistel Decl."); the Findings of Fact, Conclusions of Law, and Order Confirming the Second Amended Joint Plan of Reorganization of MSR Resort Golf Course LLC, *et al.*, Pursuant to Chapter 11 of the Bankruptcy Code ("Conf. Order"); the February 26, 2013 Order entered by the Honorable Naomi Reice Buchwald, United States District Judge ("2/26/13 Order"); and the transcripts of the Bankruptcy Court's bench decision on good faith of October 25, 2012 ("10/25/12 Tr."), the Plan confirmation hearing on February 4, 2013 ("2/4/13 Tr."), and February 5, 2013 ("2/5/13 Tr."), the Bankruptcy Court's bench decision of February 20, 2013 ("2/20/13 Tr."), the Bankruptcy Court's stay hearing on February 27, 2013 ("2/27/13 Tr."), and the District Court's stay hearing on February 28, 2013 ("2/28/13 Tr.").

[2]    As described by the Bankruptcy Court:

> A REIT is a corporation or business trust where investors combine their capital to own and, in most cases, operate income-producing real estate like the resorts here. The earnings of a REIT are taxed only at the shareholder level, assuming that the REIT satisfies other applicable requirements which are not at issue in this case.

(2/20/13 Tr. 7:12-15).  *See generally In re MSR Resort Golf Course LLC*, 471 B.R. 783, 786 (Bankr. S.D.N.Y. 2012); 26 U.S.C. § 856.

from which the instant appeal was taken.  (Conf. Order at 13).  Certain Debtors actually owned the "the land, buildings, and improvements" on the Resorts. (*Id.* at 8).  Other Debtors leased the Resorts from the Owner Debtors and paid corresponding rent.  (*Id.*).  Still other Debtors acted as managers, managing the Resorts under contract with each Tenant Debtor in exchange for management fees.  (*Id.* at 8-9).  And other Debtor entities acted as brokerages, selling and leasing elements of and rental rights in the Resorts.  (*Id.* at 9).

The Owner Debtors borrowed under a mortgage in the original principal amount of $1 billion (2/20/13 Tr. 7:23); this mortgage was placed into a securitization trust (the "Mortgage Trust") and serviced by Midland Loan Services, Inc. (Purchaser Opp. 3; Gallistel Decl. ¶ 3).  The mortgage was secured by all the assets of the Debtors as a whole, including the Resorts themselves.  (Conf. Order at 7).  The Debtors also took out four mezzanine loans of decreasing priority, as well as certain other financing agreements not at issue here.  (*Id.* at 15).  The first mezzanine loan was in the amount of $115 million and held for purposes of this bankruptcy by MetLife.  (2/20/13 Tr. 8:3-7).  The second and third mezzanine loans, for $110 million and $250 million, respectively, were held by 450 Lex Private Limited and C Hotel Mezz Private Limited (*Id.* at 8:8-14); these entities are affiliates owned and controlled by the Purchaser, GIC.  The fourth, and most junior, mezzanine loan for $50 million was held by Appellant Five Mile Capital Partners LLC.  (*Id.* at 8:15-19).

### 2.      The 2011 Bankruptcy Filings

The Debtors filed Chapter 11 cases on February 1, 2011.  (Appellant Br. 6).  The following week, the Purchaser made an offer to serve as "stalking horse bidder"[3] in an asset auction to purchase "substantially all of the [D]ebtors' assets pursuant to a Chapter 11 plan."  (2/20/13 Tr. 9:3-4).[4]  From its inception, the stalking horse bid suggested by the Purchaser provided no value to the Appellant.  As the juniormost mezzanine lender, the Appellant would be out of the money under the Purchaser's proposed bid, recovering neither the $50 million principal nor the $8 million in owed interest.  (*Id.* at 9:17-21).[5]

The Purchaser's initial offer, and a renewed offer made on April 25, 2011, were rejected by the Debtors.  (2/20/13 Tr. 9:5-8).  Instead, the Debtors entered into a settlement with all its creditors that allowed the Debtors to

---

[3]      A stalking horse bidder in a bankruptcy proceeding makes an initial bid to purchase the assets of a debtor on the theory that the initial bidder's "initial research, due diligence, and subsequent bid may encourage later bidders."  *In re 310 Associates*, 346 F.3d 31, 34 (2d Cir. 2003).  Stalking horse bidders often contract to receive a "break-up fee" compensating it for its bidding activities should a higher bid ultimately emerge and win an eventual asset auction.  *See In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

[4]      A straight asset sale was more attractive to the Purchaser, among other reasons, because it would allow the Purchaser to acquire the Resorts at a high basis with respect to the calculation of tax liability, should it later decide to sell the Resorts.  (2/4/13 Tr. 18:8-12)

[5]      On appeal, as below, the Appellant suggests that the Debtors filed an eleventh-hour amendment to the Plan that, impermissibly and for the first time, sought to eliminate its right to recover the principal and owed interest via indemnification provisions in the formation documents of certain Debtor entities.  (*See, e.g.*, Appellant Br. 11 ("Thus, on the eve of the Confirmation Hearing, the new Plan did a 180 degree about-face on the Debtors' indemnification obligations.")).  This Court agrees with Judge Lane that "the debtors' amendment to the plan was merely a memorialization of the debtors' not-so-secret position that no such indemnification obligations exist under the operative agreements; and thus, it does not constitute some sort of separate attempt to eliminate any indemnification obligations that exist under those agreements."  (2/20/13 Tr. 23:14-20).

pursue alternative restructuring bids, while guaranteeing that the Purchaser's stalking horse bid would be entered into an asset auction with stipulated bidding procedures if and when the negotiated period expired or the Purchaser failed to receive interest payments on its mezzanine loans. (Conf. Order 18-19). In the interim, the Debtors successfully conducted a number of value-maximizing restructuring initiatives. (*Id.* at 17-18). These initiatives included reaching individual settlements with the mortgage lender and the creditors in general, all of which permitted the Debtors to solicit restructuring plans and to obtain concessions with respect to unpaid default interest owed on the mortgage and mezzanine loans. (*Id.* at 19-20). Finally, during this time, the Debtors assiduously sought an alternative to the Purchaser's stalking horse bid to acquire their assets, preferring "to structure their restructuring as a reorganization or equity sale to present the best recovery to all stakeholders." (*Id.* at 20). No such alternative materialized during this interval. (*Id.* at 21).

The interest payment owed to the Purchaser in August 2012 was not made, thus triggering the Debtors' obligation to initiate an asset auction. (Purchaser Opp. 4). Even then, however, the Purchaser's bid was not immediately accepted. The auction process began in September 2012 and Debtors sought a superior bid to that proposed in the Purchaser's stalking horse bid. (*Id.* at 4-5). During this period, the Debtors "identified dozens of parties potentially interested in acquiring the resorts, negotiated over thirty confidentiality agreements, launched and maintained a data room, and

satisfied numerous incoming diligence requests." (Conf. Order 15).  No other party ultimately entered a bid.  (Purchaser Opp. 5).

The Purchaser's stalking horse bid was an offer to purchase the Debtors' assets for $1.50004 billion, which figure included a $378.8 million credit bid of the principal, non-default interest, fees, and expenses attributable to the Purchaser's mezzanine loans to the Debtors.  (Gallistel Decl. ¶ 4).[6]  This bid relied on concessions from the mortgage holder and the senior mezzanine lender to reduce their claims for default interest in the respective amounts of $56 million and $7.8 million.  (Purchaser Opp. 5; *see also* 2/27/13 Tr. 40:20-22 (noting that the senior creditors would as of March 1, 2013, forgo a total of $73 million in default interest)).

### 3.    GIC's Relationship with KSL

Prior to the filing of the Chapter 11 cases, the Purchaser had entered into agreements with KSL Capital Partners LLC, a non-party to this dispute and a former equity owner of the Resorts.  (Purchaser Opp. 10).  First, the Purchaser agreed, subject to certain triggering events, to purchase up to 100% of KSL's stake in the Mortgage Trust.  (*Id*.).  Second, KSL agreed, should the Purchaser ultimately acquire the Resorts, to serve as asset manager for those properties.  (*Id*.).  Third, each party agreed to permit the other to acquire up to 50% of any investment opportunity in the various loans or the Resorts.  (*Id.* at 11).  Despite

---

[6]       This total ultimately increased to $1,502,033,939.24.  (Gallistel Decl. ¶ 4).

this last option, KSL did not participate in the Purchaser's stalking horse bid or the eventual acquisition of the Resorts. (*Id.*).[7]

Focusing principally on the Purchaser's relationship with KSL, the Appellant contended that the Purchaser was not acting in good faith. (*See* 2/20/13 Tr. 58:16-19). A hearing on that subject was held on October 25, 2012 (the "Good Faith Hearing"), after which the Bankruptcy Court ruled that the Purchaser's good-faith status was at that time not ripe for decision, inasmuch as the relevant Bankruptcy Code provisions focus on actual, not prospective, purchasers. (10/25/12 Tr. 30:9-18). Though the Bankruptcy Court found no evidence that KSL had an interest in acquiring the Resorts, it concluded nonetheless that the Purchaser's disclosures at that time regarding its relationship with KSL were incomplete. (*Id.* at 29:2-30:7). As a matter of "best practices" (2/20/13 Tr. 59:6), the Bankruptcy Court concluded that the Purchaser, if it eventually intended to seek a finding of good-faith status, should either amend its agreement with KSL or make additional disclosures regarding KSL's involvement in, obligation to, and potential compensation resulting from the Purchaser's bid, especially whether KSL stood to receive a fee in exchange for not entering a bid of its own for the Resorts. (10/25/12 Tr. 30:19-32:1).[8]

---

[7]     In response to an inquiry from the Debtors regarding what participation, if any, KSL would undertake in connection with the stalking horse bid, the Purchaser disclosed via e-mail (i) the agreement giving KSL a participation option and (ii) the fact that KSL was advising and would serve as the asset manager should the Purchaser ultimately acquire the Resorts. (Purchaser Opp. 11).

[8]     As the Bankruptcy Court later recounted:

The Purchaser made certain additional disclosures at the Good Faith Hearing, and later provided further clarification regarding its relationship with KSL at the Confirmation Hearing held on February 4 and 5, 2013.  (*See* 2/20/13 Tr. 60:11-13 (recounting history)).  The Bankruptcy Court eventually explicitly concluded, on the basis of the extensive record created at the Good Faith Hearing and the Confirmation Hearing, that the Purchaser had indeed acted in good faith in connection with the sale of the Resorts.  (*Id.* at 60:14-16, 71:8-16; Conf. Order 51-53).

### 4.    The Asset Auction

In December 2012 the Purchaser was selected as the winner of the asset auction — a foregone conclusion in the absence of any bid from any other party.  (2/20/13 Tr. 58:9-10).  Significantly for purposes of the present appeal, all parties were on notice, throughout the pendency of the Chapter 11 cases, that an asset sale as contemplated by the Purchaser's stalking horse bid would create a large tax liability in the REIT that would go unfunded.  (Conf. Order at 21-22; *see also* 2/28/13 Tr. 22:7-21).[9]  Indeed, the Appellant accessed on four

---

The Court suggested, but did not require, that GIC RE provide additional disclosures to clarify its relationships between GIC RE and another potential bidder, KSL, who is a business partner with GIC RE, and stated that any such additional disclosures would be considered in any subsequent hearing on the issue of good faith.

(Conf. Order 17).

[9]    "[N]ormally, a REIT doesn't pay any taxes.  This is a creature of — from Congress.  And what it does is, as the REIT's assets produce income, it passes those — that income as dividends to the shareholders.  And what the Internal Revenue Code does is [it] allows the REIT to deduct … the dividend it pays to the shareholders, and offsets that against the gain it receives from getting that income.…  [A]nd as a result, as long as the REIT is having income to give to its shareholders, it offsets the gain and it doesn't face a tax.  But what's happening here is that the older entities are deciding to sell the asset.  It's

separate occasions, "far in advance ... of an order approving [the Purchaser] as a stalking horse bidder," a tax analysis by the Debtors' financial advisor that indicated the nature and likely magnitude of the REIT's tax liability.  (Conf. Order at 22).

Understandably concerned about the anticipated tax consequences, the Appellant argued to the Bankruptcy Court that (i) an indemnification provision in the formation agreements of the nine limited partnership Debtors obliged the Debtors to indemnify the REIT for this tax liability, and (ii) a guarantee of obligations by the REIT to the Appellant meant that it could stand in place of the REIT to assert a senior claim for indemnification against the Debtors, subject to the total principal and interest owed under the Appellant's fourth mezzanine loan.  (2/20/13 Tr. 19:16-21, 20:16-21:1).[10]  This argument constituted, at confirmation, the "central bone of contention" (*id.* at 18:21), and the "only remaining objection" (*id.* at 19:16); indeed, the Bankruptcy Court observed that the Appellant and the Debtors "agree[d] that feasibility hinges upon whether the debtors have an indemnification obligation" for the REIT tax liability (*id.* at 23:2-3).  There was no dispute that the Plan could not fund this liability, if it existed; the senior creditors had already compromised on certain

---

over-levered.  So the proceeds of that sale aren't going to the REIT; the proceeds of the sale are going to the creditors that are senior in the stack.  And when that happens, there's no income for the REIT to dividend up to its shareholder to offset the gain.  And as a result, the REIT gets stuck with the tax."  (2/4/13 Tr. 19:5-21 (statement of counsel for the Debtors)).

[10]   The United States also argued at the Confirmation Hearing that the indemnification provisions at issue required the Debtors to fund the tax liability generated by the sale. (Appellant Br. 10).  The Government did not seek a stay pending appeal and is not a party to this appeal.

owed payments like default interest in order to reach agreement on a total sum acceptable to the Purchaser.  (*See id.* at 42:1-10).

The Bankruptcy Court examined the parties' dispute over this issue at great length and concluded for a multiplicity of reasons that neither the indemnification provisions nor the guarantee of recourse obligations could be read as the Appellant urged.  (2/20/13 Tr. 23:21-43:18).  Accordingly, the order confirming the Plan issued on February 22, 2013.  (Conf. Order 95).

### 5. The Requests for a Stay

The Appellant requested a stay of confirmation pending appeal at the conclusion of the Bankruptcy Court's bench order confirming the plan on February 20, 2013, which request the Bankruptcy Court denied.  (2/20/13 Tr. 72:2-25).  The Appellant then sought a "limited stay" from Judge Buchwald, requesting that the amount of its claim be withheld from distribution to creditors pending resolution of the appeal.  The District Court denied that appeal as procedurally barred, concluding that the Appellant had failed to request from the Bankruptcy Court the "limited stay" it was then seeking.  (2/26/13 Order 3-5).

Returning to the Bankruptcy Court, the Appellant applied for a "limited stay" or "holdback."  (2/27/13 Tr. 11:8, 11:16).  The Bankruptcy Court denied this application as failing to meet the Bankruptcy Code's requirements for stays pending appeal.  (*Id.* at 34:24-44:16).  The Appellant then returned once again to Judge Buchwald to seek its limited stay.  The District Court — noting that "undisputed facts in this record ... strongly, even dramatically, militate

10

against granting a stay pending appeal" (2/28/13 Tr. 3:16-18), and further observing that it was "hard to conceive of how any court could reach a decision contrary to" the Bankruptcy Court's decision (*id.* at 4:17-18) — denied the stay application for a second time (*id.* at 16:25-17:4).

The sale transaction closed with the deposit into escrow of the appropriate sums on February 27, 2013 (Purchaser Opp. 21), and the Plan took effect with the distribution of those sums to creditors on February 28, 2013 (*id.* at 22).

## B.   The Instant Litigation

The Appellant filed a notice of appeal on April 12, 2013.  (Dkt. #1).  By stipulation filed on April 29, 2013, the parties established a briefing schedule. (Dkt. #8).  The Appellant filed its opening brief on May 10, 2013.  (Dkt. #9).  On June 7, 2013, the Debtors filed a brief in opposition (Dkt. #10) and a supporting declaration (Dkt. #11), and the Purchaser filed its own opposition (Dkt. #14) and supporting declaration (Dkt. #15) on the same day.  The Appellant filed its reply brief on June 28, 2013.  (Dkt. #26).

## DISCUSSION

## A.   The Standard of Review

Under 28 U.S.C. § 158(a), district courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts.  A district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree."  Fed. R. Bankr. P. 8013.  "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly

11

erroneous....” *Id.* Legal conclusions by the bankruptcy judge receive *de novo* review on appeal. *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2021 (2013).

"While the bankruptcy court's findings of fact are not conclusive on appeal, 'the party that seeks to overturn them bears a heavy burden.'" *In re Lehman Bros. Holdings, Inc.*, 415 B.R. 77, 83 (S.D.N.Y. 2009) (quoting *H&C Dev. Group, Inc.* v. *Miner (In re Miner)*, 229 B.R. 561, 565 (2d Cir. BAP 1999)). "A finding is 'clearly erroneous' when" the reviewing court is "left with the definite and firm conviction that a mistake has been made." *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009) (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "In regards to mixed questions of law and fact, the Court must review findings of fact under the clearly erroneous standard and the conclusions of law *de novo*." *In re Premier Operations*, 294 B.R. 213, 217 (S.D.N.Y. 2003) (citing *In re United States Lines, Inc.*, 197 F.3d 631, 640–41 (2d Cir. 1999)); *see also Truck Drivers Local 807, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.* v. *Carey Transp. Inc.*, 816 F.2d 82, 88 (2d Cir. 1987).[11]

---

[11]    There is some ambiguity in the correct standard of review for mixed questions of law and fact in bankruptcy appeals. The Second Circuit has adopted alternative positions to the one relied upon here, including that mixed questions should receive *de novo* review, *see In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003), and that the court should engage in a balancing analysis and apply the appropriate standard of review "depending on whether the question is predominantly legal or factual," *Italian Colors Rest.* v. *Am. Express Travel Related Servs. Co.*, 554 F.3d 300, 316 n.11 (2d Cir. 2009), *vacated on other grounds sub nom. Am. Express Co.* v. *Italian Colors Rest.*, 130 S. Ct. 2401 (2010). In this regard, there is some question as to whether it is still appropriate to rely on the Second Circuit's *Italian Colors* decision, as ordinarily vacatur "'eliminat[es] a judgment,'" *Anderson* v. *Green*, 513 U.S. 557, 560 (1995) (modifications in original) (quoting *United States* v. *Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)), and "avoids 'giving preclusive effect to [the] judgment'" so disposed of, *Van Wie* v. *Pataki*, 267 F.3d 109, 115 (2d Cir.

**B.     Analysis**

This appeal is moot for two reasons.  It is statutorily moot under § 363(m) of the Bankruptcy Code because the Purchaser qualifies for the protections accorded a good-faith purchaser of a debtor's assets; since § 363(m) imposes a jurisdictional bar, the Court may not, even were it inclined to do so, examine the merits of the Appellant's arguments.  This appeal is also equitably moot because the Appellant has not (and cannot) overcome the presumption that an appeal of an unstayed, substantially consummated sale is moot; here, no effective relief can be fashioned without undoing the Plan in its entirety.  Accordingly, this appeal is dismissed.

**1.     Statutory Mootness**

**a.     The Purchaser Qualifies as a Good Faith Purchaser Under § 363(m)**

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  In short, this section "limits appellate jurisdiction over an unstayed sale order issued by a Bankruptcy Court to the narrow issue of

---

2001).  Perhaps because the *Italian Colors* vacatur was on other grounds, judges in this District continue to rely on it in discussing the appropriate standard for appellate bankruptcy review.  *See, e.g.*, *In re Strawbridge*, No. 11 Civ. 6759 (PAE), 2012 WL 701031, at *4 (S.D.N.Y. Mar. 6, 2012), *appeal dismissed* (June 5, 2012).  Irrespective of this abstract lack of clarity in the law, there is no question that bankruptcy court determinations of good-faith conduct are factual conclusions subject only to clear error review.  *See In re Lehman Bros.*, 415 B.R. at 84.

whether the property was sold to a good faith purchaser." *In re Motors Liquidation Co.*, 428 B.R. 43, 53 (S.D.N.Y. 2010). Section 363(m) allows sales to achieve finality without "the risk of endless litigation," *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997) ("*Gucci II*"), and maximizes the value of assets without the need to discount for the possibility of "challenge even after closing the sale," *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 249 (2d Cir. 2010).

The Second Circuit has explained that § 363(m) amounts to "an imposed jurisdictional limit on [a court's] authority to review the Bankruptcy Court's sale order." *In re WestPoint Stevens, Inc.*, 600 F.3d at 247 (citing *In re Gucci*, 105 F.3d 837, 838 (2d Cir. 1997) ("*Gucci I*") ("We hold that ... we have no jurisdiction to review an unstayed sale order once the sale occurs, except on the limited issue of whether the sale was made to a good faith purchaser.") (modification in original)). Though § 363(m) does not with absolute clarity forbid a court that is reviewing a bankruptcy order of sale to a good faith purchaser from ordering "some form of relief other than invalidation of the sale," *Gucci I*, 105 F.3d at 840 n.1, it does explicitly forbid courts from "revers[ing o]r modif[ying]" the sale, and courts have "regularly ruled that the appeal [from such a decision] is moot," *id.* at 839. "[U]nder section 363(m), [courts] lack jurisdiction to review the entire Sale Order — not just the actual sale transaction." *In re WestPoint Stevens, Inc.*, 600 F.3d at 248. "Moreover, section 363(m) applies even when a stay was denied by the district court after a motion for a stay *was* timely made because statutory mootness recognizes that a reviewing court 'may be powerless to undo or rewrite the terms of the

consummated sale.'" *In re Motors Liquidation Co.*, 428 B.R. at 53 (quoting *Gucci I*, 105 F.3d at 840) (emphasis in original).

"'The Bankruptcy Court's finding of good faith … is either a factual question or mixed question of fact and law that must be reviewed for clear error.'" *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO* v. *United Technologies Corp.*, 610 F.3d 44, 51-52 (2d Cir. 2010) (quoting *In re Motors Liquidation Co.,* No. 09 Civ. 7794 (RWS), 2010 WL 1730802, at *7 (S.D.N.Y. Apr. 28, 2010)); *see also In re Lehman Bros. Holdings, Inc.*, 415 B.R. 77, 84 (S.D.N.Y. 2009) ("The good-faith purchaser determination is a mixed question of law and fact.  Thus, this Opinion must review the issue of whether the Bankruptcy Court applied the correct legal standard *de novo;* and it must review the court's factual determinations under the clearly erroneous standard." (internal quotation marks and citation omitted)).

The Bankruptcy Court did not commit clear error in concluding, as a factual matter, that the Purchaser acted as a good faith purchaser of the Debtors' assets.[12]  In positing the contrary, the Appellant contends that the Purchaser was party to a secret anticompetitive agreement with KSL, which agreement it only disclosed after it "obtained an unsuccessful result from the

---

[12]   The Appellant submits that the good faith purchaser determination should receive *de novo*, not clear error, review.  As observed above, the standard of review applicable to mixed questions of law and fact is indeed subject to some dispute. What is not in question, however, is that a bankruptcy court's determination whether a purchaser's conduct during a sale satisfies the good-faith requirement of § 363(m) is a factual one subject to review only for clear error.  *See, e.g.*, *Dist. Lodge 26*, 610 F.3d at 51-52; *In re Motors Liquidation Co.*, 2010 WL 1730802, at *7; *In re Lehman Bros.*, 415 B.R. at 84; *In re Metaldyne Corp.*, 421 B.R. 620, 625 (S.D.N.Y. 2009); *In re Angelika Films 57th, Inc.,* Nos. 97 Civ. 2293 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *6 (S.D.N.Y. May 29, 1997).

Good Faith Hearing," and that this *post hoc* disclosure cannot serve to cure its misconduct.  (Appellant Br. 24).  These arguments are mistaken at best and disingenuous at worst.[13]  The Bankruptcy Court never "found" anything with regard to the "salience of the fact" that the Purchaser's agreements with KSL were not disclosed before the Good Faith Hearing.  (Appellant Reply 4).  Nor is it correct to say that the Bankruptcy Court "did not find that [the Purchaser] was a good faith purchaser as a consequence of its actions prior to September 10, 2012" (*id.* at 9), except insofar that the Bankruptcy Court made no conclusive findings at all at the Good Faith Hearing (10/25/12 Tr. 30:10-14; 2/20/13 Tr. 58:22-59:5).  The Appellant's characterizations are no more correct now than they were at the Confirmation Hearing, when the Bankruptcy Court rejected them by finding that the Appellant "has misinterpreted the Court's prior ruling on good faith."  (2/20/13 Tr. 58:22-23).

At the Good Faith Hearing, the Bankruptcy Court ruled only that it was then "premature to rule on the issue of good faith ... because [the Code sections] contemplate protections for a successful purchaser" and, at the time, "[n]o sale ha[d] occurred" in the Debtors' Chapter 11 cases.  (10/25/12 Tr. 30:10-14).  The additional disclosures the Purchaser ultimately made regarding its relationship with KSL were suggested by the Bankruptcy Court (*id.* at 31:3-24), as a matter of "best practices" (2/20/13 Tr. 59:6), to ensure that KSL and the Purchaser were indeed independent actors with respect to

---

[13]     Fully aware of the marked divergence between the Appellant's position and the express terms of the Bankruptcy Court's oral Order, the Court prefers to conclude that the Appellant has severely misunderstood the record.

bidding for the Debtors' assets (10/25/12 Tr. 30:24-31:20).  The Bankruptcy Court found that these additional disclosures clarified the record on this issue and, despite its continued claims to the contrary, the Appellant has never adduced "any evidence or rationale suggesting the auction process was unfair; that [the Purchaser] and KSL colluded to affect price, that there was any fraud, or that there was any action that would deny" the Purchaser the protections of § 363(m).  (2/20/13 Tr. 63:5-8).

These, then, are the factual results the Appellant must overturn on appeal to defeat § 363(m)'s jurisdictional bar.  It cannot meet the "heavy burden" necessary to do so.  *In re Lehman Bros.*, 415 B.R. at 83.  The Appellant simply has not provided any reason to doubt the Bankruptcy Court's conclusion that the agreement between the Purchaser and KSL had no effect on the sale price of the Debtors' assets, much less sufficient evidence to provide a "definite and firm conviction" that the Bankruptcy Court was in error.  Indeed, KSL twice declined the opportunity to cooperate in the Purchaser's financial activities regarding the Resorts: in 2010, when the Purchaser acquired the second mezzanine loan, and again in 2011, after the Purchaser made its first offer to serve as a stalking horse in an eventual asset auction.  (Purchaser Opp. 13; 10/25/12 Tr. 14:19-21).  To this day, KSL has never shown an interest in entering a bid on its own behalf for the Debtors' assets.  (10/25/12 Tr. 35:13-17).

Unlike in the cases the Appellant cites, the relationship between the parties here was not aimed at controlling the price in the auction and, in fact,

had no effect on the course of bidding or the eventual sale.  For example, the
Appellant seeks to rely on *In re Beck Indus., Inc.*, 605 F.2d 624 (2d Cir. 1979),
which involved an agreement designed to "eliminate" an interested party as a
bidder by effecting collusion between two potential bidders on their mutual
behalf, concealing the possible profitability of a break-up of the debtor's assets
rather than a unitary sale, and thereby "keep[ing] the price down" at the
eventual auction.  *Id.* at 633-36.  Moreover, the content of the agreement at
issue was kept a secret until after the auction had closed and the colluding
bidders had won.  *Id.* at 629-32.  Under these circumstances, the auction itself,
in Judge Friendly's memorable phrase, "became a game of blind-man's buff."
*Id.* at 636.  Nothing of the kind took place here: the appropriate disclosures
were made long in advance of the auction, and the agreements at issue in no
way influenced the conduct or outcome of the auction of the Debtors' assets.

In re Hat, 310 B.R. 752 (Bankr. E.D. Cal. 2004), is equally off the mark.
Just as in *Beck*, *Hat* concerned a winning bidder who had secretly colluded
with two actively interested potential bidders, with the express intention of
removing these parties from bidding so as to minimize the price of the sale.  *Id.*
at 758-59.  But KSL never expressed any interest at all in bidding on the
Debtors' assets, much less the kind of active engagement with the auction
(preparatory, of course, to collusive arrangements with the "winning" bidder)
evinced by the parties in *Hat* and *Beck*.  Here, there is simply no evidence that
the Purchaser's agreement with KSL had any effect on the conduct or
conclusion of the auction.

As the Second Circuit has made clear, the Court has jurisdiction to hear a single class of argument against an unstayed order authorizing the sale of a debtor's assets: "challenges to the good faith aspect of the sale." *In re WestPoint Stevens*, 600 F.3d at 248.  The Appellant cannot unseat the Bankruptcy Court's determination that the Purchaser acted in good faith in acquiring the Resorts here.  Accordingly, this appeal is moot.

### b. Section 363(m) Applies Here Because the Purchaser Bought the Debtors' Assets Outright and the Relief the Appellant Seeks Would Affect the Validity of the Plan

As a last-ditch effort to avoid statutory mootness, the Appellant makes two equally unpersuasive arguments disputing the applicability of § 363(m) in the first instance.  First, the Appellant submits, the Purchaser was not a purchaser at all, but simply a recipient of "an excess distribution in its capacity as a junior mezzanine creditor before senior claims were paid in full.  Had some other party outbid [the Purchaser] and purchased the assets in good faith, this would still be the case." (Appellant Br. 4).  The content of this argument is left as an exercise for the reader, but might be interpreted as the position that the Purchaser, rather than purchasing title to the Resorts, actually acquired the interest of the senior creditors in the various financing instruments burdening the Resorts and then received their entire value as an in-kind distribution. This labored view of events would effectively bar any creditor from receiving the benefit of § 363(m)'s protections when acquiring the assets of a debtor and cannot be correct, especially as pre-petition creditors routinely acquire the assets of debtors and receive the protection of § 363(m).  *See, e.g.*, *In re*

*Metaldyne Corp.*, 421 B.R. at 622; *see also In re 255 Park Plaza Assocs. Ltd. P'ship*, 100 F.3d 1214, 1217-18 (6th Cir. 1996) (refusing to "endorse a rule that would cast a shadow over the finality of" asset sales to creditors).

What happened here was a sale, pure and simple. The Purchaser had offered throughout to acquire the Resorts outright rather than participating in a non-sale reorganization. (Conf. Order 18). The Debtors sought at length throughout the pendency of the Chapter 11 cases "to structure their restructuring as a reorganization or equity sale to present the best recovery to all stakeholders," rather than the asset sale the Purchaser offered; these efforts were unsuccessful. (*Id.* at 20-21). Indeed, the structure of the transaction as an asset sale was critical to the Purchaser. Any alternative approach had significant negative tax implications for the Purchaser, especially with regard to any future effort to sell the acquired assets. (2/4/13 Tr. 17:25-18:12). Conclusively, the Confirmation Order explicitly acknowledged that "the Property shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances" on the effective date of the sale. (Conf. Order 57). The Purchaser bought the Resorts, it did not receive a distribution, and § 363(m) applies.

Second, the Appellant argues that § 363(m) is irrelevant because the relief it seeks would not "'[a]ffect the validity of the sale.'" (Appellant Br. 23 (quoting 11 U.S.C. § 363(m))). In this regard, the Appellant insists it is seeking one of two permissible forms of relief not barred by § 363(m): either the Court should order the Purchaser to pay the Appellant, subject to the Plan's

requirement of "payment in full of all unsecured and administrative claims"; or the Purchaser should transfer to the Appellant a prorated share of its "ownership interests" in the Resorts. (*Id.* at 4). Indeed, the Appellant insists it "is not seeking to upend the Plan but to *enforce* it." (*Id.* at 22 (emphasis in original)).

As Judge Cote wrote when confronting similar arguments, the line the Appellant seeks to draw between its sought relief and impermissible invalidation of the sale "is a specious distinction." *In re Metaldyne*, 421 B.R. at 626. The parties arrived at the dollar value of the sale after extensive negotiation regarding the value of the assets and the claims of the creditors. Indeed, though the Appellant suggests that the Plan required payment "in full" of all claims against the Debtors, the payments actually made under the Plan were tailored to significant compromises by the senior creditors against the total sums owed. (*See* 2/27/13 Tr. 40:20-22; *see also* 2/20/13 Tr. 53:6-7 (noting that "there are creditors senior to [the Appellant] who have not been paid in full")). As the Bankruptcy Court held, the Appellant "will not be permitted to argue that it is no longer subordinated merely because certain lenders have made concessions." (2/20/13 Tr. 42:13-15).

The Plan itself was conditioned on the sale of the Resorts to the Purchaser free and clear of all claims. (*See* Conf. Order 28 ("The Indemnification Claims are Disallowed."); *id.* at 57 ("the [Resorts] shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances....")). More than that, the very claim the

Appellant asserts here — inventive as it was — was the "central bone of contention" (2/20/13 Tr. 18:21) at the Confirmation Hearing, and all the parties "agree[d] that feasibility hinge[d] upon whether" the Appellant had a right to the recovery it seeks here (*id.* at 23:2-3).  The Bankruptcy Court found — and it did not clearly err in finding — that the Plan could not have been confirmed had the Appellant's indemnification claim been allowed. Whether structured as some form of joint tenancy, as the Appellant suggests (Appellant Reply 6), or simply as a payment of $58 million from the Purchaser to the Appellant, the allowance of the Appellant's indemnity claim would upset and invalidate the delicate balance struck by the parties and confirmed by the Bankruptcy Court.  The Appellant's *ipse dixit* that it seeks only to reallocate the assets in question does not diminish the extent to which its relief would affect the validity of the sale.

    The Appellant cites three cases in support of its position, all confronting markedly dissimilar factual settings.  In *Mission Iowa Wind Co.* v. *Enron Corp.*, 291 B.R. 39, 41-42 (S.D.N.Y. 2003), the court permitted an effort to seek a true reallocation of cash when a substantial portion of the payment from the purchaser to the sellers would, due to the corporate structure implicated, flow back upstream into the bankrupt estate and so return to the bankruptcy court's jurisdiction after the asset sale was complete.  *In re S. Edge LLC*, 478 B.R. 403, 412 (D. Nev. 2012), permitted an appeal in the face of § 363(m) when the issues on appeal all "related only to the potential impact of Plan provisions on litigation claims or defenses in other actions" between the debtors and

various creditors.  And *In re C.W. Mining Co.*, 641 F.3d 1235, 1239 (10th Cir. 2011), allowed an appeal to proceed when relevant authority suggested that the appellant would be able to receive monetary relief for its claims without disturbing the terms of the sale.  All three cases are inapposite.  Here, no funds remain under the jurisdiction of the Bankruptcy Court from which the Appellant could seek distribution; the issues on appeal relate solely to whether the critical disallowal of its claim was correct (and, by extension, whether the Plan was rightly confirmed); and it is impossible for the Appellant to recover on its claim without invalidating the sale as a whole.  Section 363(m) precludes such appeals.

Because § 363(m) applies and because the relief the Appellant seeks would affect the validity of the sale, the Court has jurisdiction to hear a single argument: whether the Purchaser qualified as a good faith purchaser for § 363(m) purposes.  The Bankruptcy Court concluded that it did, and this conclusion was not clear error.  This appeal is moot.

### 2.    Equitable Mootness

Even were the Court to conclude that the Bankruptcy Court committed clear error in finding that the Purchaser acted in good faith, this appeal would still be equitably moot because the Court cannot fashion effective relief.

Equitable mootness is a prudential doctrine allowing dismissal of a bankruptcy appeal "'when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'"  *In re Charter Commc'ns, Inc.*, 691 F.3d at 481 (quoting *In re Chateaugay Corp.*, 988 F.2d

23

322, 325 (2d Cir. 1993) ("*Chateaugay I*")).  Equitable mootness "is concerned

with whether a particular remedy can be granted without unjustly upsetting a

debtor's plan of reorganization."  *Id.*  "'[E]quitable mootness applies to specific

claims, not entire appeals' and must be applied 'with a scalpel rather than an

axe.'"  *Id.* at 481-82 (quoting *In re Pac. Lumber Co.*, 584 F.3d 229, 240-41 (5th

Cir. 2009) (modification in original)).

"[A]n appeal is presumed equitably moot where the debtor's plan of

reorganization has been substantially consummated."  *In re Charter Commc'ns*,

691 F.3d at 482.  "Constitutional and equitable considerations dictate that

substantial consummation will not moot an appeal" when five specific factors

are satisfied.  *In re Chateaugay Corp.*, 10 F.3d 944, 952–53 (2d Cir. 1993)

("*Chateaugay II*").  Those five requirements, all of which are necessary to

overcome the presumption of equitable mootness, are:

> (a) the court can still order some effective relief;
>
> (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity;
>
> (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court;
>
> (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and
>
> (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a

> situation rendering it inequitable to reverse the orders
> appealed from.

*Chateaugay II*, 10 F.3d at 952-53 (internal quotations, citations, and modifications omitted).  There is no dispute here that the Plan is substantially consummated and has been since the transfers of title and funds took place on February 28, 2013.  (*See* Appellant Br. 21; Purchaser Opp. 17; Debtor Opp. 9). The Appellant thus must satisfy all five of the above requirements to defeat the presumption of mootness.  This it cannot do.

As the Appellant itself frames the issue, the analysis here requires determining whether the Court would have to disturb the Plan to grant the relief it seeks.  (Appellant Reply 4).  The Court has already found that ordering the Purchaser to pay the Appellant $58 million or to transfer an equivalent interest in the Resorts to the Appellant would have just that effect.  This conclusion is of a piece with the positions taken by the Appellant and all the other parties to this dispute during confirmation and adopted by the Bankruptcy Court:

> [T]he issue of indemnification is one that stands in the way of confirmation.  There's no dispute that the current plan does not provide sufficient funds to pay this transaction tax.  Indeed, [Appellant] and the debtors agree that feasibility hinges upon whether the debtors have an indemnification obligation for the transaction tax.

(2/20/13 Tr. 22:23-23:3; *see also id.* at 21:12-20 (observing that the Appellant had "vigorously prosecuted" the position that the "indemnification obligations were a bar to confirmation" "throughout the confirmation process")).

Before this Court, the Appellant suggests that it simply wants the Court to order the Purchaser to "writ[e] one check" to the Appellant for $58 million. (Appellant Reply 5).  Whatever the rhetorical appeal of that phrase, the true substance of the Appellant's application is something quite different, *viz.*, recognition and allowance of a claim it contends had priority over in-the-money claims and thus should have been paid as part of the sale transaction.

The Appellant's claim is not against the Purchaser directly, but against the estates of the Debtors.  Payment of that claim should come out of the sale funds, not out of the Purchaser's pocket; the Appellant's argument is not that the Purchaser should have made a separate $58 million dollar transfer, but that the Plan should have provided for an extra $58 million to be deposited in escrow and distributed to the Appellant.  Now, however, the funds allocated for the sale transaction have been distributed to all the in-the-money creditors. The Appellant cannot simply demand that the Purchaser make another, separate payment.  For the Appellant to have received $58 million, the Purchaser would have had to agree to pay that $58 million in the first place. And had the Appellant's claim been a deal term, the Purchaser might have sought additional concessions from other parties; or it might have tried to negotiate concessions from the Appellant itself to accept a lesser sum in satisfaction; or the Purchaser might simply have walked away from the deal altogether.  The Court cannot determine alternative forms the Plan might have taken.  For that very reason, the Court cannot order effective relief without disassembling the Plan in its entirety and the Appellant cannot satisfy the

*Chateaugay* factors.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 145 (2d Cir. 2005) ("If appellants' claims are substantial (as they urge), it is as likely as not that the bargain struck by the debtor and the released parties might have been different...."); *see also In re Source Enterprises, Inc.*, 392 B.R. 541, 550 (S.D.N.Y. 2008) ("It is clear ... that courts have found it difficult to sever one piece of a Plan...."); *In re Delta Air Lines, Inc.*, 374 B.R. 516, 523 (S.D.N.Y. 2007) (observing that nullifying one element of a consummated bankruptcy plan "while leaving the remainder of the consummated Settlement intact would ignore the tradeoff that allowed the parties to settle in the first instance and would treat a non-severable provision of the Settlement Agreement as dispensable"), *aff'd sub nom. Ad Hoc Comm. of Kenton Cnty. Bondholders* v. *Delta Air Lines, Inc.*, 309 F. App'x 455 (2d Cir. 2009) (summary order).

Nor can the Appellant find any succor in its repeated avowals that the Plan requires payment in full of all claims, given that the senior creditors only recovered subject to substantial concessions.  (2/20/13 Tr. 42:11-15).  And regardless of what payments the Plan obliged the Purchaser to make, there is no doubt that the Appellant's claim was never among them.  Indeed, disallowing that claim was the essential final step allowing the Plan to be confirmed and the sale to proceed.  Had the Bankruptcy Court allowed the Appellant's claims, there would have been no sale at all.

Compelling the Purchaser to pay that claim now would disturb the sale for the same reason that it was an obstacle to confirmation: in the Purchaser's

business judgment, the Resorts lack adequate value to justify the additional expenditure of paying the Appellant's claim.  It was for this reason that provisions in the Plan and the Confirmation Order expressly disallowed the claim at issue — provisions subject to the Plan's nonseverability clause.  *See In re Charter Commc'ns*, 691 F.3d at 485 (observing that "a nonseverability clause may be one indication that a particular term was important to the bargaining parties").  In sum, for the same reason that the Appellant's sought relief would affect the validity of the Plan, as discussed above with respect to § 363(m), the Court cannot order effective relief here without tearing the Plan itself apart.  This appeal is equitably moot.

## CONCLUSION

Were the Court to consider the merits of the Appellant's claim, it would almost certainly conclude, as Judge Buchwald did, that it is "hard to conceive of how any court could reach a decision contrary to" the Bankruptcy Court's careful and well-reasoned decision.  (2/28/13 Tr. 4:17-18).  As it happens, however, this appeal is moot.  First, it is moot as a statutory matter under § 363(m), because the Bankruptcy Court did not commit clear error in finding that the Purchaser acted in good faith, and because the relief the Appellant seeks would affect the validity of the sale of the Resorts.  On this basis, the Court lacks jurisdiction to hear any other argument and the appeal must be dismissed.

Even had the Purchaser not acted in good faith, this appeal would remain equitably moot.  The Court cannot order relief here without disturbing

the transaction as a whole.  Such appeals are not permitted when the sale of a debtor's assets has been substantially consummated.  The Resorts have been sold, title has transferred, the creditors have been paid, and the Purchaser has proceeded to act as the new owner of the Resorts in every respect.  Given this unquestioned consummation, the Appellant cannot be permitted to proceed with an appeal threatening the disruption of the sale itself.

Accordingly this appeal is dismissed.  The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: January 7, 2014
       New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge